UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM H. CAMP, JR., d/b/a UNIVERSAL BUSINESS SYSTEMS,<br><br>Defendant. | Civil No. 2:08-cv-00292-RSM<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

**FINAL JUDGMENT OF PERMANENT INJUNCTION**

Plaintiff, United States of America, moves for summary judgment of permanent injunction, pursuant to Federal Rule of Civil Procedure 56 and Internal Revenue Code (I.R.C., 26 U.S.C.) §§ 7402, 7407, and 7408, against Defendant William H. Camp, Jr., individually and doing business as Universal Business Systems. The United States seeks to prevent Camp from further promoting an unlawful tax scheme in violation of I.R.C. §§ 6700 and 6701, and from preparing federal tax returns for others. Defendant Camp did not respond to the United States' motion. The Court construes Defendant Camp's silence as an admission that the motion has merit. *See* Local Rule CR 7(b)(2). Accordingly, the Court makes the following findings of fact and conclusions of law and enters this permanent injunction.

**Findings of Fact**

The Court finds that because Camp has failed to answer the Requests for Admissions properly served on him by the United States, the matters therein are deemed admitted pursuant to FRCP 36(a)(3). Based on a full review of all of the evidence, the Court finds as follows:

1. Defendant William Camp resides in and operates his business, Universal Business Systems, in the District of Columbia. Camp prepared tax returns on behalf of many state of Washington residents. (Pl.'s St. of Undisputed Facts ¶ 2.)

2. Camp is not a certified public accountant, and has never held an accounting license, but is a non-CPA accountant and an income tax return preparer who prepares federal income tax returns. Camp has described, or allowed himself to be described, as an accountant. He continues to advertise his accounting services. (Pl.'s St. of Undisputed Facts ¶ 3, 4, 31.)

3. Camp assisted in the organization and planning of the Mining Interest Development Action Strategy ("MIDAS") program, a scheme promoted through Merendon Mining (Colorado), Inc. ("Merendon"), a Colorado corporation that indicated that it owned two formerly active gold mines in Colorado and Arizona. Merendon affiliates told investors that, with new technology, the mines might be able to produce gold and other minerals. Camp provided Merendon prospectuses to clients. (Pl.'s St. of Undisputed Facts ¶ 5.)

4. The prospectus provides that Merendon has developed a mineral program that allows participants to obtain an interest in minerals produced at a mine in Jamestown, Colorado. It provides that the investors must collectively invest $100 million annually and investors will receive 50% of the minerals extracted as a result of their respective ownership share of the total investment. (Pl.'s St. of Undisputed Facts ¶ 6.)

5. Between and including 2003 and 2005, Camp was contacted by, or he otherwise communicated with, persons who had received his name from a Structurist (Merendon marketing representatives) or other persons affiliated with the Institute for Financial Learning, Capital Alternatives, Merendon, Merendon Mining (Nevada), Inc. or any of their affiliates. (Pl.'s St. of Undisputed Facts ¶ 7.)

6. Between and including 2003 and 2005, Camp participated in communications with customers, prospective customers, investors or prospective investors, or members or prospective members of the Institute for Financial Learning, Capital Alternatives, Merendon Mining (Colorado), Inc., Merendon Mining (Nevada), Inc. or any of their affiliates, concerning the MIDAS program. (Pl.'s St. of Undisputed Facts ¶ 8.)

7. During one or more of the communications described in Paragraph 6, Camp stated that one was eligible for a deduction pursuant to Internal Revenue Code (26 U.S.C., I.R.C.) § 616 because of one's participation in the MIDAS program. (Pl.'s St. of Undisputed Facts ¶ 9.)

8. Persons who participated in MIDAS were required to sign Mining Agreements obligating them to contribute a certain amount of funds toward the development of mines owned by Merendon. The investments in Merendon were treated as "development expenditure payments." (Pl.'s St. of Undisputed Facts ¶ 10.)

9. Camp told Merendon investors about the tax consequences of mining development deductions pursuant to § 616 of the Internal Revenue Code. Specifically, Camp stated that it was legal or otherwise consistent with the internal revenue laws to claim a federal income tax deduction for mining development expenses pursuant to I.R.C. § 616, upon participation in the MIDAS program. (Pl.'s St. of Undisputed Facts ¶ 11.)

10. After he prepared their tax returns, Camp stated to one or more customers that the returns he had prepared were legal or otherwise in compliance with the internal revenue laws. (Pl.'s St. of Undisputed Facts ¶ 12.)

11. Camp told participants in the MIDAS program that they did not have to pay the amounts provided in their Mining Agreements prior to submitting the tax returns he prepared. (Pl.'s St. of Undisputed Facts ¶ 13.)

12. Between and including 2003 and 2005, Camp contacted, or was contacted by, potential or actual participants in the MIDAS program concerning his preparation of federal income tax returns for such persons. Camp requested and obtained the federal income tax returns

| | | |
|---|---|---|
| 1 | | of individuals for one or several of the tax years including 1997, 1998, 1999, 2000, 2001, |
| 2 | | and 2002. (Pl.'s St. of Undisputed Facts ¶ 14.) |
| 3 | 13. | Between and including 2003 and 2005, Camp prepared amended federal income tax |
| 4 | | returns for all of the persons listed in his letter to the Internal Revenue Service (IRS) of |
| 5 | | November 14, 2006. (Pl.'s St. of Undisputed Facts ¶ 15.) |
| 6 | 14. | Camp prepared amended income tax returns for at least 22 MIDAS customers, claiming a |
| 7 | | deduction pursuant to I.R.C. § 616. Camp prepared tax returns claiming Merendon- |
| 8 | | related deductions for clients from Washington, Florida, California, Texas, Georgia, and |
| 9 | | New York. (Pl.'s St. of Undisputed Facts ¶ 16.) |
| 10 | 15. | On each of those amended federal income tax returns, Camp determined the amount of the |
| 11 | | claimed § 616 deduction based on the amount of taxes reported on the taxpayers' original |
| 12 | | federal income tax returns. When he prepared each of the amended returns, Camp knew |
| 13 | | that the taxpayers had not paid toward the development or production of any mine the |
| 14 | | amounts Camp listed on the amended tax returns. (Pl.'s St. of Undisputed Facts ¶ 17.) |
| 15 | 16. | Instead of reporting deductions based on amounts customers had actually invested in the |
| 16 | | mining scheme – which would have been zero in many cases – Camp reported deductions |
| 17 | | based on the entire amount of customers' purported ten-year contractual investment. |
| 18 | | Camp prepared the amended income tax returns for Merendon investors for the year 2002 |
| 19 | | including the contractual expenditures as ordinary deductions. (Pl.'s St. of Undisputed |
| 20 | | Facts ¶ 18.) |
| 21 | 17. | Camp, either independently or in collaboration with other persons involved in Merendon, |
| 22 | | prepared amended federal income tax returns indicating that customers made a mining |
| 23 | | investment in the year 2002, in part because in the year 2002, internal revenue laws |
| 24 | | allowed losses to be carried back five years, rather than the otherwise applicable |
| 25 | | three-year period. (Pl.'s St. of Undisputed Facts ¶ 19.) |
| 26 | 18. | None of the persons for whom Camp prepared federal income tax returns had paid any |
| 27 | | amounts toward the development of any mines to Merendon, Merendon Mining (Nevada), |
| 28 | | |

Inc., the Institute for Financial Learning, Capital Alternatives, or any predecessors, successors or affiliates thereto prior to and including December 31, 2002. None of the Mining Agreements signed by MIDAS participants for whom Camp prepared federal income tax returns were completed and signed prior to December 31, 2002. (Pl.'s St. of Undisputed Facts ¶ 20.)

19. Camp similarly knew or had reason to know that Merendon, Merendon Mining (Nevada), Inc., the Institute for Financial Learning, or any other person or entity on their behalf, had not paid, on behalf of MIDAS participants, the amounts he reported on the tax returns, toward the development of any mining facility. (Pl.'s St. of Undisputed Facts ¶ 21.)

20. Camp knew that any mining expenses actually spent between and including 2002 and 2005 by Merendon, Inc., Merendon Mining (Nevada), Inc., the Institute for Financial Learning, or any other person or entity on their behalf, were for the production of ores or minerals, rather than the development of a mine. (Pl.'s St. of Undisputed Facts ¶ 22.)

21. Camp, either independently or in collaboration with other persons involved in Merendon, prepared the tax returns for MIDAS customers in part to increase the total amount of reported deductions. Camp reported that one or more persons had paid, as mining development expenses, amounts in excess of their income for the applicable tax year, in order that those persons could obtain a refund of taxes previously paid to the United States. (Pl.'s St. of Undisputed Facts ¶ 23.)

22. Neither Camp nor his customers knew, or had a reasonable basis to believe, that ore or minerals had been disclosed to investors (with respect to the mines described in the MIDAS prospectus and accompanying documents), in commercially marketable quantities sufficient to reasonably justify commercial exploitation. (Pl.'s St. of Undisputed Facts ¶ 24.)

23. Camp knew that the persons for whom he prepared returns had not paid or incurred the expenditures he reported as deductions under § 616 on the returns. (Pl.'s St. of Undisputed Facts ¶ 25.)

24. Camp knew that his Merendon customers did not materially participate in any activity concerning the mines identified in the MIDAS prospectus or the operation of Merendon, Merendon Mining (Nevada), Inc., the Institute for Financial Learning, or any other affiliated entity. (Pl.'s St. of Undisputed Facts ¶ 26.)

25. At all times prior to and after the preparation of the income tax returns for MIDAS customers, Camp knew that the investments for which he reported a deduction pursuant to I.R.C. § 616 were not "at risk," as provided by the internal revenue laws. (Pl.'s St. of Undisputed Facts ¶ 27.)

26. In preparing each of the federal income tax returns described above, Camp knew that the taxpayers were likely to submit the documents and returns he prepared to the IRS in affiliation with the determination of their federal tax liabilities, or otherwise in connection with a material matter arising under the internal revenue laws. (Pl.'s St. of Undisputed Facts ¶ 28.)

27. Camp knew that the tax returns or documents would result in an understatement of the tax liability for the persons for whom Camp prepared the returns. Camp knew that the reported deductions under I.R.C. § 616 were matters material to the determination of the taxpayers' federal tax liabilities. (Pl.'s St. of Undisputed Facts ¶ 29.)

28. Camp prepared an additional opinion letter dated November 1, 2003 in which he represented that he was an accountant and purported to advise Merendon about how customers could report their Merendon "investments" on their tax returns. (Pl.'s St. of Undisputed Facts ¶ 30.)

29. At the time he prepared the opinion letter, Camp had not read or otherwise consulted any legal authority concerning the applicability of the deduction under I.R.C. § 616. In addition, he knew that MIDAS participants had not paid any money directly toward any mining development or production activity. (Pl.'s St. of Undisputed Facts ¶ 32.)

30. At the time he prepared the opinion letter, Camp knew that MIDAS participants were not engaged in the business activity of mining, and did not intend to become so engaged. (Pl.'s

St. of Undisputed Facts ¶ 33.)

31. Camp knew that the opinion letter was likely to be distributed or would potentially be distributed to prospective and actual participants in the MIDAS program. (Pl.'s St. of Undisputed Facts ¶ 34.)

32. Some investors in Merendon received tax opinion letters, which stated that the development expenses paid by customers were deductible. (Pl.'s St. of Undisputed Facts ¶ 35.)

33. Camp charged his customers fees based on the complexity of the returns prepared, and charged one Seattle customer $4,000 to prepare one original tax return and five amended tax returns. Camp charged each of his MIDAS customers amounts up to $4,000 to prepare the amended tax returns. (Pl.'s St. of Undisputed Facts ¶ 36.)

34. One Camp customer paid over $3 million in federal income tax for the years 1997 through 2002 based on total income of approximately $8 million reported on his federal income tax returns. Camp prepared amended returns eliminating the vast majority of the customer's income tax liability for 1997 through 2002, and claiming large tax refunds for those years. (Pl.'s St. of Undisputed Facts ¶ 37.)

35. The majority of Camp's customers in the MIDAS program had Net Operating Loss ("NOL") carrybacks, as a result of Camp's claimed deductions under § 616. Camp did not treat the losses generated by the MIDAS deductions as passive activity losses, pursuant to § 469 of the Internal Revenue Code. (Pl.'s St. of Undisputed Facts ¶ 38.)

36. Camp prepared and submitted to the IRS one or more Forms 2848 granting him authorization to act as a Power of Attorney on behalf of the MIDAS participants for whom he prepared amended federal income tax returns. (Pl.'s St. of Undisputed Facts ¶ 39.)

37. Camp represented participants for whom he and Eric Peterson had prepared tax returns containing Merendon-related deductions. Peterson was enjoined by the United States District Court for the Southern District of Texas in January 2009. Camp maintained

|   |   |   |
|---|---|---|
| 1 |    | contact with his customers who were participants in Merendon during 2006 when he |
| 2 |    | represented some of them during IRS examinations. (Pl.'s St. of Undisputed Facts ¶ 40.) |
| 3 | 38. | In a December 7, 2004 meeting with the IRS in connection with its audit of three MIDAS |
| 4 |    | participants, Camp admitted that he had prepared a number of federal income tax returns |
| 5 |    | claiming mining deductions, but he refused to name other customers for whom he |
| 6 |    | prepared similar returns. In the meeting, Camp claimed that Merendon had asked him to |
| 7 |    | appear at the interview in order to explain the transaction and facilitate acceptance of the |
| 8 |    | refund claims. After Camp received a formal request from an IRS Area Director, he |
| 9 |    | supplied to the IRS a list of some customers for whom he had prepared tax returns. (Pl.'s |
| 10 |    | St. of Undisputed Facts ¶ 41.) |
| 11 | 39. | In the same meeting, Camp claimed that he had researched I.R.C. § 616 extensively and |
| 12 |    | was knowledgeable about preparing amended income tax returns. Camp also stated that |
| 13 |    | the federal tax returns he prepared were correct and complied with the internal revenue |
| 14 |    | laws regarding mining development investment deductions, though he knew or had reason |
| 15 |    | to know that the tax returns were not correct or in compliance with the internal revenue |
| 16 |    | laws. (Pl.'s St. of Undisputed Facts ¶ 42.) |
| 17 | 40. | With respect to IRS audits, Camp requested that customers have the IRS direct inquiries |
| 18 |    | regarding their tax returns directed to him. Camp told his MIDAS customers not to agree |
| 19 |    | to the IRS's proposed treatment of their tax returns or other matters concerning the |
| 20 |    | returns. (Pl.'s St. of Undisputed Facts ¶ 43.) |
| 21 | 41. | The IRS issued refunds to some Merendon investors. (Pl.'s St. of Undisputed Facts ¶ 44.) |
| 22 | 42. | Camp did not tell any persons for whom he prepared federal income tax returns pursuant |
| 23 |    | to the MIDAS program that they could be subject to penalties or criminal prosecution for |
| 24 |    | failing to accurately report their income, deductions, or other information on their federal |
| 25 |    | income tax returns. (Pl.'s St. of Undisputed Facts ¶ 45.) |

**Conclusions of Law**

This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1340 and 1345, and

26 U.S.C. §§ 7202(a), 7407, and 7408 because Camp has prepared tax returns and promoted the MIDAS program to persons within the state of Washington. In order to obtain an injunction under § 7407, the United States must prove that Camp, an income tax return preparer, engaged in conduct subject to penalty under I.R.C. §§ 6694 or 6695. For an injunction under § 7408, the United States must prove that Camp engaged in conduct subject to penalty under I.R.C. §§ 6700 or 6701. Finally, for an injunction under § 7402, the United States must show that an injunction is necessary or appropriate for the enforcement of the internal revenue laws.

The United States has met the requirements for an injunction under the statutes cited above. Camp violated I.R.C. § 6700 by promoting and selling the MIDAS mining development scheme, and knowingly making materially false or fraudulent statements to customers regarding the allowability of deductions under I.R.C. § 616. Camp made materially false statements to customers regarding the amounts they had to pay in order to be eligible to claim mining development deductions, Merendon Mining's use of customer contributions, and the legality of the claimed mining development expenses. Camp also prepared an opinion letter for distribution to customers falsely claiming that the mining deductions were legal. Camp knew that his statements were false. Camp knew that customers were not actually eligible for deductions under I.R.C. § 616 because none of the customers, or Merendon Mining, had paid any amounts toward the development of any mines in the year 2002. Furthermore, neither Camp nor his customers knew, or had a reasonable basis to believe, that ore or minerals had been disclosed in commercially marketable quantities sufficient to reasonably justify commercial exploitation.

Camp violated I.R.C. §§ 6701 and 6694 by preparing tax returns for customers claiming fraudulent mining deductions for customers who had not incurred the expenses reported, had not made any payments in the year 2002 (the year that Camp reported the deductible payments occurred), and whose payments, even if made, would not have been deductible under I.R.C. § 616. The deductions Camp reported for customers' purported development expenditures did not meet the required factors for § 616 because neither Camp nor the customers knew that ore or minerals existed in commercially marketable quantities. Any amounts paid by Merendon or

Camp's customers were toward production, rather than development expenses, and were not actually at risk pursuant to the terms of the Mining Agreement. Finally, Camp offset the claimed mining development expenses against non-passive income in violation of the internal revenue laws. Camp knew that the mining deductions he reported on customers' tax returns were not proper, would more likely than not be not sustained on the merits, and would result in understatements of customers' true income tax liabilities.

Injunctive relief fulfills the legislative purposes of I.R.C. §§ 7402, 7407, and 7408 because Camp has demonstrated a pattern of promoting abusive tax schemes. Camp failed to consult with any tax professional prior to drafting his 2003 opinion letter, and admits he is not a licensed CPA, though he claims to be. There is a significant likelihood Camp will continue promoting the MIDAS tax schemes and preparing false and fraudulent tax returns absent an injunction. He prepared amended returns for at least 22 MIDAS customers, and his conduct is likely to continue absent an injunction because, even when the IRS confronted him with the incorrect returns, Camp continued to insist the deductions were proper, though he had not consulted any tax professional on the matter. Further, Camp advised customers not to cooperate with the IRS, and failed to notify them that they could be subject to civil and criminal penalties as a result of the tax returns he prepared. Finally, Camp's occupation as an accountant, without the necessary license to practice, and tax return preparer place him in a position where further violations are likely.

The United States has met the factors for injunctive relief under I.R.C. §§ 7402, 7407, and 7408. Further, a limited injunction prohibiting Camp only from participating in the prohibited conduct is not sufficient because of his failure to admit the falsity of the returns he prepared, and continued pattern of violations. Camp admits that he continues to hold himself out as an accountant though he has no CPA license, and has willfully prepared returns in blatant disregard for the internal revenue laws claiming millions in fraudulent deductions. Camp continued to advise customers that his positions on the tax laws are correct despite numerous IRS audits indicating otherwise. An injunction is necessary and promotes the goals of the statute because, absent an injunction, Camp will continue to promote this or other fraudulent tax schemes. Camp

has made no acknowledgment that the MIDAS scheme he promoted was fraudulent, that the tax returns he prepared were false, and he has made no defense in this action and therefore offers the Court no reason to believe he will not continue to violate the internal revenue laws absent an injunction.

The United States has made the requisite showing that an injunction is warranted under I.R.C. §§ 7402, 7407, and 7408. The government's Motion for Summary Judgment is hereby GRANTED. The Court enters the following permanent injunction against William Camp, individually and doing business as Universal Business Systems.

## **Permanent Injunction**

**IT IS HEREBY ORDERED** that Defendant Camp, and all those in active concert or participation with him, are permanently **ENJOINED** pursuant to I.R.C. §§ 7402, 7407, and 7408 from directly or indirectly:

(a) Organizing, promoting, or selling the Mining Interest Development Action Strategy ("MIDAS") program associated with Merendon Mining, Inc. and its subsidiary corporations;

(b) Making false or fraudulent statements, in connection with the organization or sale of a partnership, plan, or other arrangement, about the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of participating in the partnership, plan, or other arrangement;

(c) Organizing, promoting, selling, or advising participation in any other partnership, plan, investment, business venture, or arrangement that makes false or fraudulent representations about federal tax benefits or treatment because of participation in such tax shelter, plan, investment, business venture, or arrangement;

(d) Causing or assisting other persons and entities to understate their federal tax liabilities and avoid paying federal taxes;

(e) Preparing or assisting others in the preparation of any tax forms or documents on behalf of any other person or entity including a claimed deduction under I.R.C. § 616 for which the taxpayer has not made any mining development investment;

(f) Engaging in any other conduct subject to penalty under I.R.C. § 6700, including making or furnishing, in connection with the organization or sale of a partnership, plan, or arrangement, a statement that he knows or has reason to know to be false or fraudulent as to any material federal tax matter, or by making a gross valuation overstatement;

(g) Engaging in conduct subject to penalty under I.R.C. § 6701, including preparing or assisting others in the preparation of any tax forms or other documents to be used in connection with any material matter arising under the internal revenue laws and which

he knows will (if so used) result in the understatement of another person's tax liability;

(h) Engaging in any conduct subject to penalty under I.R.C. § 6694, including preparing tax returns for customers reporting an understatement of liability due to an unreasonable position without substantial authority or more likely than not to not be sustained on its merits;

(i) Engaging in any conduct subject to any penalty under the I.R.C.; and

(j) Preparing or filing, or helping others to prepare or file, federal tax returns, amended returns, or any other tax-related documents or forms for any other person or entity other than himself.

(k) Falsely representing himself to be a certified public accountant, a non-certified accountant, or other tax professional;

(l) Falsely representing his experience or education as a tax return preparer; and

(m) Misrepresenting the terms of this injunction to customers or prospective customers, or anyone else.

**IT IS FURTHER ORDERED** that Camp mail a copy of this Order and a cover letter informing all persons for whom he prepared one or more tax return(s) including a deduction under I.R.C. § 616 or who otherwise participated in the M.I.D.A.S. program of the entry of the Court's findings and injunction, that their tax returns are likely false, that they may be subject to penalties because of the fraudulent tax returns. Camp must mail the Order and cover letter to these identified persons within 20 days of the date of this Order, and must file a sworn certificate stating that he has complied with this requirement and listing the names and addresses of all persons he has notified, within 22 days of the date of this Order.

**IT IS FURTHER ORDERED** that the Court retains jurisdiction for purposes of implementing and enforcing the final judgment and any additional orders necessary and appropriate to the public interest. The United States may engage in post-judgment discovery to monitor Camp's compliance with this injunction

**IT IS FURTHER ORDERED** that this Order of Permanent Injunction shall serve as a final judgment in this matter, with each party to bear its own costs.

Dated this 29 day of April, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

Submitted and agreed by:

JEFFREY C. SULLIVAN
United States Attorney

___/s/ Jacqueline Brown_____
JACQUELINE C. BROWN
THOMAS W. CURTEMAN, JR.
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Washington, D.C. 20044
Telephone: (202) 616-9482 (Brown)
           (202) 616-9379 (Curteman)
Fax:       (202) 514-6770
Attorneys for Plaintiff, the United States